May it please the court. I'm Clay Smith, appearing on behalf of the appellant Herzog. I'm an assistant attorney, or rather a deputy attorney general for the state of Idaho. Again, may it please the court. The genesis of this case is a prosecution commenced in Bannock County District Court during May 2011 in connection with an abortion that allegedly occurred in December of 2010. Over time, however, it has evolved into a rather complicated set of issues, of which the most important was not in the case at the outset. And that issue is whether Ms. McCormack's attorney, who is also a licensed but non-practicing physician, may offer medical, or what are sometimes referred to as medication abortions, which would allow his patients to complete the abortion in their own homes in a manner that the appellant believes is inconsistent with the relevant FDA drug label and with protocols promulgated by the American College of Obstetricians and Gynecologists and the National Abortion Federation. Against this rather remarkable and unprecedented background, let me lay out the discrete issues before the Court today. The first issue is whether Ms. McCormack's challenge to her 2011 prosecution is moot. We believe the answer to that question is plainly yes. The second issue is whether the terms, quote, properly, close quote, end, quote, satisfactory, close quote, in Idaho Code Section 18-6081, which controls the performance of first trimester abortions in Idaho, whether those terms are impermissibly vague. The third issue, and we believe the most important issue for purposes of this case, is whether Dr. Hearn's proposed provider plan is consistent with the interests of his putative patients, Bannock County women. The answer to the latter two questions is no. Unless the Court has questions about the mootness issue, that is to say the issue going to the whether or not a justiciable case or controversy exists over the 2011 prosecution. The initial decision. That's correct. That was basically the dispute to which the preliminary injunction was directed and to which the panel decision in the first appeal was directed. Well, I don't necessarily agree with you that it is moot, so why don't you explain your position and why you think it's moot. Judge, the prosecuting attorney Heidemann, before he left office in January of this year, made a determination, this is back in August of last year, excuse me, August of 2012, not to continue prosecution of Ms. McCormick for the 2010 abortion or alleged abortion. That basic determination is subject to, we believe, a substantial amount of deference in terms of it being a conclusive determination or termination of any intent to prosecute Ms. McCormick. And there is, obviously, in the American cargo case, precedent from this circuit as well as other circuits, it stands for the proposition that an official's determination to cease what was an allegedly invalid or unconstitutional action is entitled to a presumption of essentially regularity. Beyond this, beyond that basic presumption, Prosecutor Heidemann in October of 2012 signed an agreement for giving Ms. McCormick transactional immunity with respect to the alleged abortion. And in that agreement, Ms. McCormick was granted the right to remain in the United States.  That's a significant measure on it, and it also requires her to cooperate, and perhaps she didn't want to enter the agreement because she didn't want to cooperate with Heidemann? Your Honor, she did not enter into the agreement. The reason or reasons for her non-entry are not developed in the record. But I think the critical aspect of the grant on the part of Mr. Heidemann of transactional immunity is that it underscores his intent and its intent that has been endorsed by a successor in office, prosecuting attorney Herzog, not to prosecute Ms. McCormick for the 2010 alleged abortion. But doesn't this fall into the classic exception for mootness, voluntary cessation? Well, and that is why the American cargo case is so important. Right. And given the circumstances of this case where you have the prosecuting attorney making a final determination not to prosecute, followed up by his grant or attempted grant, in this instance we think the grant is binding, of transactional immunity, that the Ms. McCormick will be prosecuted for the alleged abortion. I might add further. What's the statute of limitations on that? The limitation period is five years under Idaho Code on 19-402. Is it five years up? It will be up in December of 2015. So there's nothing preventing the prosecutor from changing his mind at any time, right? Theoretically, that's correct. But prosecuting attorney Herzog, whose term of office expires in January of 2007, actually 2018, excuse me, 2017, has again joined or concurred in prosecuting attorney Heidemann's determination. So, again, we think that... Does that give her the full relief that she seeks in any event? It does with respect to the 2010 abortion. Doesn't she also want declaratory and injunctive relief? As to... Well, yes. Because at this point, your attorney general could change his mind at any time. We could decide, okay, it's moot, dismiss the case, and then he could change his mind and prosecute her. Well, actually, I believe the attorney general does not have that authority. But assuming the attorney general doesn't, it is simply, I would respectfully submit, speculation to believe or to... You know, I always got this statute on the books that it essentially prohibits the procedures that Dr. Hearn wants and that Ms. McCormick availed herself of, and then that's the case. And I'm wondering who else is in the position to challenge it other than the two plaintiffs that you have here. Well, if we're talking about future pregnancies, we've not challenged Dr. Hearn's third-party standing to challenge Idaho Code Section 18-606. The undue burden there, of course, is the mere, is the ability, essentially, for the woman to be prosecuted because of a physician's failure to comply with Idaho Code Section 18-608, which is, which sets forth the basic rules of the road with respect to abortions in Idaho. But what was the purpose of Heidemann's move to moot the case? Well, the rationale for Mr. Heidemann's determination not to prosecute was his conclusion that there was this other, well, he already prosecuted, but not. Well, not, I'm sorry. Not to prosecute. Not to go after her again. Not to initiate a new prosecution. Yeah. The determination not to initiate a new prosecution was based on his conclusion that they could not develop, they being his office, could not develop the, the, the grounds necessary to essentially establish reasonable cause for, for prosecution, and that it was not an appropriate expenditure of further resources in his office to continue this process. So you, you accepted the Court's decision, this Court's decision, on the grounds of the constitutionality? No, Your Honor. The, just so there's no confusion, his determination was based without reference to the later determination by this Court that, that affirmed Judge Windmill's preliminary injunction decision. It was based on, it was based on his conclusion that further prosecutorial efforts were simply not warranted. Well, that you had a, you, right, are you saying that right from the start you didn't have a, a chargeable case? Well, I think this prosecuting attorney, Heidemann, took, took the position both before the magistrate judge in, in State court that there was probable cause. The magistrate judge disagreed. Yeah. But I, I believe that Prosecutor Heidemann thought at the time he initiated the prosecution that there was probable cause. He obviously concluded that to the extent that he didn't have probable cause based on what the magistrate court held and the inability to develop any further evidence that he would be unlikely to be able to establish probable cause in the future. Well, so one would, it seems that, that he got, that a decision came down that Heidemann didn't like and he thought, well, we'll go ahead and dismiss this case. They'll move the case and we'll live to fight another day. Was that behind all this? Well, Your Honor, no. The, his decision to not pursue further prosecution was based again, was made prior to the, this Court's issuance of its decision on the preliminary injunction or in the preliminary injunction appeal in September of 2012. So it, although obviously he, he, he probably got a pretty good idea how the case was going to turn out from argument. That's true, Your Honor, but, but, but again, there was no mooting the, the case with respect to the 2010 or 2011 prosecution. Did not move the case with respect to the more basic claim directed to the validity of, of 18-606, which is the criminal provision directed or allowing a woman to be prosecuted for a failure of a physician to comply with 608. That's a felony under Idaho law. It is, that's correct. So the point. Minimum one year in prison. Correct. Maximum five. That's correct, Your Honor. Uh-huh. But again, the, the validity of that provision with respect to future prosecutions was still left in the case. The mootness pertained only to the 2011 prosecution of Ms. McCormick. And at that point, of course, Dr. Hearn had been granted intervention in the case. That occurred in, in June of 2012. Do you want to save a little time for rebuttal? I do, Your Honor. Okay. And at this point, I, I think I will do precisely that. Thank you. Thank you. May it please the Court. Attorney General Clay. Mr. Hearn, let me just, before you get started, tell you what troubles me most about your case. Casey says that the fact that a law has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it. Looking at that, tell me, what is the undue burden placed on a woman's ability to obtain an abortion by the requirement that all second trimester abortions take place in the hospital? Yes, sir. The District Court, as well as the Attorney General's Office, found that the 608-2 requiring that all abortions take place in the hospital violate two Supreme Court decisions, U.S. Supreme Court decisions from 1983. And that is because back in 1983, 30 years ago, medical science had progressed so far that pre-viability abortions could be safely performed outside of a hospital. And we suggest that... Just tell me, what is the burden? The burden is that a woman would need to be admitted to the hospital to have an abortion that she could safely have outside the hospital. Is there any reason to believe that she couldn't get to a hospital? For Ms. McCormick and other women, it can be prohibitive if they do not have insurance. And in Idaho, like many states, Medicaid does not cover it. I understand that that is an economic impact, but when it is unnecessary, when that state statute puts unnecessary medical restrictions that raise the cost, we contend, I contend, that is an undue burden. And so, I believe, did the U.S. Supreme Court, and so did the Attorney General's Office of Idaho, and so right. You know, expense wasn't a consideration in Casey, was it? It was not. That's correct. Can you just, in a sentence, tell me what the undue burden is placed on all women by the requirement of hospitalization in all of the second trimester? In some cases, hospitalization would be indicated. I cannot say that there are no cases in the second trimester where a hospital wouldn't. But it is a burden, and it is prohibitive, and ends... Tell me what the burden is. The burden is that if hospitalization is required, doctors in Bannock County, Idaho, will not provide medical abortions. Is that in the record? Yes. There are no doctors providing medical abortions in Bannock County. One doctor, myself, has asked to, and no doctors are providing, that is in the record, abortions, second trimester or first trimester abortions in Bannock County or southeast Idaho. Ms. McCormick had to go to Salt Lake City in order to have an outpatient abortion in Utah. If asked... What about the hospitals? Do hospitals there, are they willing to provide abortions? I have no... There's nothing in the record that a hospital would prevent a doctor, if a doctor was not threatened with prosecution under this statute, from prescribing, from allowing a doctor to perform an abortion in the hospital. And in fact, I am sure that abortions in emergency situations have been done, but not non-therapeutic abortions have not been done. They're not available in Idaho because the doctors will not provide them. Because there's a statute that puts them at risk for a felony, if they do provide those abortions outside the hospital. If it may please the court, if asked, the prosecutor, as well as his client, I mean his representation in the Attorney General, would concede that not one of these statutes that we're talking about is constitutional. But unconstitutional statutes, just like unloaded guns, can still threaten people that they're pointed toward. At least until it's known that the statute is unconstitutional, the doctors and the women in Idaho will have these statutes pointed toward them by prosecutors. Take Idaho Code 18-505, that's the fetal pain statute. Mr. Smith and his office, the Attorney General, told the legislature before that statute was enacted that it was constitutional. Unconstitutional, I apologize. Not only did he tell them that, the district court in this case... That it was or it was not? It was not constitutional. It was unconstitutional. The legislature, like many of my clients, never listened to Mr. Smith, and they passed it despite knowing that. And the district court found that the purpose of that statute, because they'd been warned it was unconstitutional, was to burden women. Now, of course, they didn't have Isaacson v. Horn, where this court has also found a similar statute in Arizona to be unconstitutional. So, no one really is contending that the fetal pain statute in Idaho is constitutional. By the way, cert has been denied in Isaacson. Well, then let's take the hospital statute that we were just talking about. The same Attorney General's office told the legislature 15 years ago that that statute was unconstitutional. It applies to both women and doctors. Both can go to prison for five years if a second trimester abortion is performed outside the hospital. Second trimester is 14 weeks, if there's an objective standard. So, if a doctor or the patient somehow miscalculate the dates, then the doctor and his patient under 608 subsection 2 may be sentenced to five years in prison. What did the legislature, has it done in the last 15 years? Nothing. Therefore, Mr. Herzog or Mr. Heidemann, the county prosecutor, have a statute on the book. They have a woman, Ms. McCormick, who they believe violated the statute. That was the contention in this case that when she took the pills to have a medical abortion, what she did wrong was she took them outside of a hospital. Why don't you calm down a little bit, you'll have a heart attack. At my age, Your Honor, that's certainly true. I apologize. Okay. Okay. So, that was the allegation there. The legislature just left the statute there. Well, this court has already said that the statute that puts women in jail because they don't do things right, don't go to an office that is properly equipped and staffed, they don't go to an office where the doctors made satisfactory arrangements with a hospital, that a woman could go to jail. This court, as well as the district court, have found that to be unconstitutional, and the state does not appeal that. So, what we really have are all of the statutes. There's no dispute. They're unconstitutional under the view of my opponent, as well as me, and as well as part of it, this court has already ruled. So, what is needed here? It's needed to figure out who, as Judge Wardlow discussed in the Stolman case, where there was a pharmacy and a pharmacist, if not us, if not me and my client who has been prosecuted for having second trimester abortion, who can challenge these statutes where a court such as this can finally tell the people of Idaho, these statutes are like unloaded guns. They're not threatening. Doctors can prescribe abortions consistent with Casey, and that patients can then get them in Idaho consistent with Casey and the promise of Casey. Have you been indicted? No, sir. I thought you just said you were. No, I have not been indicted. I have not been charged. Oh, okay. And the issue is, is whether because I have yet to be indicted and yet to be charged. You got your hands behind your back. I thought maybe your hand caught it. Because I have yet to be indicted or charged whether I have standing in order to challenge these statutes, the statutes having to do with physicians. I guess the problem I have with your standing is that, as I understand it, you are licensed. You have medical to practice medicine. That's correct. But you've never practiced in this field. And you've never before, as I understand it, prescribed these kinds of drugs. And you've just merely expressed a desire to do so. So how does that create standing? Yes, Your Honor. The standing I have is I have practiced and prescribed those drugs before. This is not as though I'm suggesting I will go back and do a residency in obstetrics and gynecology. Methotrexate, misoprostol are drugs prescribed by doctors like me, and I have prescribed them on numerous occasions, not to pregnant women, but on numerous occasions. I have, there's an undisputed intent. What are they used for? What are their other uses? Methotrexate is an anti-cancer drug, but it's also used to treat rheumatoid arthritis, and I am a rheumatologist. Misoprostol is used to protect the stomach lining, and it's used when you give Celebrex and other kinds of drugs such as that, non-steroidals. And so those are, and I was, still am, and so I've prescribed probably more methotrexate than any doctor in Idaho, and as much misoprostol. I have not prescribed mifepristone, which is an abortifacient. And, but today, especially after the humble decision, Planned Parenthood of Arizona, by this court, recent decision on the preliminary injunction, the Klein decision, prescribing these medications outside the confines of the FDA label, according to medical discretion, has been held to be, statutes that prevent that have been held to be unconstitutional. But I would like to remind the court, I am not suggesting that my way and what I have said I intend to do, and the court has so found as a fact, which I believe would be reviewed as clear error, that I have that intent. But what I intend to do is only necessary to be reviewed for standing purposes. Please do not conflate it with the merits. If I have standing, then I can challenge for these statutes. And then we're not confined to just whether or not we'll do medical abortions, but it's these statutes affect on any abortions by any women in Idaho, if they're held to be unconstitutional, as the district court and we all have agreed. So the issue is, do I have Article III standing? I believe it's been conceded by the other side that I do. They do not dispute my intent. No court has ever looked at the propriety of the way the doctor has suggested he would do it, whether it was medically appropriate. How could any doctor claim to be medically appropriate when what he wants to do is a felony punishable by five years in jail? It's not medically appropriate by that standard. But I should, as any doctor should, be able to challenge it, and then on the substance find out if the statute is constitutional, not whether my plan is appropriate. Once I have standing, I should not be being judged any more than McCormick's wisdom in having her abortion. I am not some untrained person, 20 years in practice in that county. If not me, who? Well, what about the midwives? Midwives cannot in Idaho perform abortions. And then the reason there are no midwives or doctors other than me prescribing, that would like to prescribe this, is the threat of being prosecuted. Doctors have nice lives in Idaho. And to step into this mess and become an abortionist, to be publicized as an abortionist, will ruin their practice. There is, it is, you don't have people jumping into courts that are doctors and saying, please, you know, I really want to commit a felony here, and please go, you know, incur the expense and the trouble to go fight this battle. It is, there is no one else in Idaho to challenge these statutes in Vannet County that are practiced there. And the retired label is, I do still practice medicine. I just do not have an office. I prescribe medicine to my family and my friends, including Ms. Apostle. Let me ask you a question since you're a doctor and a lawyer and a man of great knowledge. Just to put it in perspective, looking back at history, the past, say, 125, 150 years, would, is it safer for women to have their childbirth assisted at home by midwives or in a hospital by doctors? The standard of care. I asked you a question. Yes, your Honor. You don't know the answer to that? I do. Well, tell us, what's the answer? It's equally safe both places. What? It's equally safe both places. You ever hear of a doctor named Schimmelweiss? No, is he German? Schimmelweiss? Yes, I, did you go to medical school? Yes, sir, I did. He's the one that figured out that women were dying in Vienna when they were giving birth to children at a very high rate because the doctors were not washing their hands. Okay. You don't know about that? I do know. And there was a rate with midwives, the survival rate was very high. You hadn't heard of that? I apologize. Where did you go to medical school? I went to the University of Alabama and I did my internship at L.A. County being close by. But, no, I did not know that. Today, midwives and doctors both are doing... If you go to Prague... Washington. The main street in that city is named after him and the big hospital is named after him.  Do you do any traveling? I've been to Prague. But I did not... I'll go the next time. Okay. Tell him I sent you. Thank you. So, let me just... Can you address the mootness point that the opposing counsel argued at length? Excuse me? Can you address the mootness point that the opposing counsel argued at length? Yes. The mootness question is in our brief. There are the four exceptions. But probably the most important one is the voluntary cessation exception. And that one, no bad faith, but it was only after prosecuting McCormick and then losing in front of the district court and this court that he decided that he had no evidence to prosecute her father. And more importantly, he would not concede, and the district court noted that, he would not concede that prosecutions under that statute are unconstitutional. He would not concede the illegality or concede that this court had been right when it held that McCormick would likely succeed on the merits. Yet he has not appealed that decision to this court a second time. And prior to when this case was first filed... Well, he has a right to do that. Yes. Okay. Yes. When this case was first filed, the prosecutor, Mr. Heidemann, did submit an affidavit which allowed the case to continue in which he said, I am intending to investigate her father and consider refiling charges. His second affidavit that was unsigned where he promises not to charge her again, even if she confesses, we don't believe is enforceable and it's a voluntary secession. If there are no further questions, I'll end here. All right. Thank you. I do want to just acknowledge Judge Fletcher. Thank you. The issue in this case with respect to Idaho Code 18-6082, the Second Trimester decision, turns directly on Dr. Hearn's proposed provider plan, which anticipates women completing the abortion in what he refers to as the privacy of their own homes. As we developed before the district court, the use of medical abortion in Idaho in the Second Trimester is called medical abortions by medical induction. It is an extremely complex procedure that requires highly specialized expertise and also requires completion of the abortion in a suitably equipped hospital or clinic. In other words, Dr. Hearn's proposed provider plan is inconsistent with, antagonistic to, the well-being of the class of individuals for whose rights he's attempting to assert. So are you ‑‑ but he said that you conceded he had standing on that issue? No, we've never conceded he has standing on that issue. In fact, as we've pointed out in our briefing, we've challenged his third-party standing to assert the, as an undue burden claim, the rights of these patients under his proposed provider plan in the Second Trimester, because, again, the kinds of medical abortions that he desires to perform are appropriated most during the first nine weeks of pregnancy. That is consistent with the ACOG protocols as well as NAF procedures and standards. The notion that he, therefore, can challenge 6082 or, for that matter, the Pain Capable Unborn Child Protection Act is simply incorrect. The merits of those statutes is simply, in our view, not before the court, because he does not have standing, given his proposed provider plan, to challenge those statutes. It's as simple or as complex as that. The Attorney General has issued his views on the constitutionality of, for example, the Pain Capable Unborn Child Protection Act. But the mere fact that, as an academic matter, that statute may be unconstitutional does not give this Court jurisdiction to make that determination in the absence of Dr. Hearn having standing, and he does not have third-party standing. I thought you conceded that Dr. Hearn had standing under a particular subsection. We've conceded that Dr. Hearn has standing to challenge 18606 based on the notion that holding a woman criminally liable for the noncompliance of a physician with 608 is unconstitutional, and he has standing to assert that component of undue burden. But to the extent that he is alleging that denial of access to his proposed provider plan constitutes an undue burden with respect to second-trimester abortion, is a different kettle of fish. And as to that particular kettle, we've argued, and continue to argue, that it should be an undue burden. We've argued that he lacks third-party standing. It was a bad analogy, and I apologize. My time has elapsed. Well, I have a question. Why is it not an undue burden to require a woman on the 99th day of her pregnancy to go to a hospital? Well, Your Honor, the Dr. Another day being the first day of the second trimester. That's correct. The city of Akron case was an as-applied challenge brought with respect to a particular type of medical procedure, dilation and evacuation. I say that because what the court held there was that access to a properly staffed and equipped clinic during the early portion of a second-trimester abortion was, given the change in technology, consistent with the interests of the woman. So in that sense, city of Akron was a highly limited case. It was an as-applied challenge. In this instance, we have not challenged the ability or the propriety of medical induction abortion in a clinic during the second trimester. What we have challenged is Dr. Hearn's third-party standing to prescribe medications to affect a medical abortion during the second trimester without compliance with protocols that would allow that abortion to occur in either a hospital or a clinic. So to answer your question, whether it is appropriate to allow an abortion to be to take place in a clinic in the second trimester must be determined with reference to the particular procedure used. In Akron, the court concluded that use of a clinic for D&Es in the early part of the second trimester abortion was medically acceptable because, again, changes and improvements in technology. The opposite is true here because there is no medical foundation for allowing a second-trimester abortion to occur outside of a clinic. So the question is whether it is appropriate to allow clinical supervision in a hospital or acidually-equipped clinic, as, for example, occurred or at least allegedly occurred with respect to Ms. McCormick in December of 2010. I'm not sure if I've addressed your question, but I think that's the best I can do. Thank you. Thank you.
judges: Walter, PREGERSON, WARDLAW